My name is Cindy Pollack and may it please the court I represent the appellant and today I have I'm honored to have EEOC behind the appeal of Mrs. Colwell and Miss Brenner is argue going to argue the failure to accommodation issues and I will be handling the adverse action. I reserved two times for two minutes for rebuttal and so I'm going to be addressing the adverse action which all claims with the exception of the failure to accommodate claim was rejected by the district court based on him finding that there was no issue of fact there was an issue of fact that only a jury could decide because you have my client who was denied a reasonable accommodation request she was placed in a cubby she has we have testimony she was she was placed in what she called it a cubby hole like in a works like a workspace sometimes you call if there's a divider you call it a cubby hole and she was what was that what does that have to do with any disability it has to do with the adverse that the court did find that she had our cases later said that if there is an adverse action and there was a disability involved that the plaintiff has made out a case and I agree with you that if they show that they have a disability later cases seem to do that the ones of work came down after your brief was written yes you have the peg bonus case that did it was not a presidential opinion but it does allow a claim to go we had a presidential opinion I think you're the case goes down here to the fact that your client had a disability and she couldn't get to work at night and therefore couldn't take care of the night shifts she had requested a date yes okay it's my understanding your honor that she had requested daytime shifts so that it was that that was not accommodated okay why didn't she pursue the accommodations request with the management after the union can't mean well she I didn't hear the question Joe well she resigned before the union and the management had finished their discussions about the change of shifts okay and I would disagree with you your honor she had tried she had gone to the manager please listen the union representative canceled the first management correct if I could only regret correct there was a discussion between and they had talks and it didn't the plaintiff expect that the union would reschedule this conference with management the the first activity that the union did was actually talk with the manager and the manager she did yes the union representative she after the management turned her down she went to the union representative he talked to management and then he canceled the meeting schedule and before they could have another meeting between the union management she resigned and I disagree with you honor only because the union representative I agree with the fact I don't agree with the fact that the first step was this meeting that was going to be held the first step was the union representative contacting that manager and talking to her about giving this lady daytime shifts and that was the first thing and guess what the union representative told my client that that's out there's nothing I can do and I understand why you feel discriminated against that's step number one step number two step number two is the meeting that never occurred and I can tell you it anyone like why didn't it occur according to the record okay the judge had said it was because she didn't show but it was no meeting and as a manager as a manager I have an obligation once someone comes to me and says that there's an issue here you've got an employee who thinks that she's being discriminated against that is the management's responsibility to make sure that I sit down with that employee because I'm the one who's got all the power the employer and the manager so that should be coordinated by the manager not by my and my client she's only the employee is there a legal obligation that before you can file a disability discrimination suit you have to sit down and talk to each other there is under some statutes is there any such in this case well in the reasonable accommodation aspects of it yeah there always should be discussions between both because an employer is not going to be held liable yes on a reasonable accommodation but certainly not in a discrimination claim a harassment or hostile work environment you distinguish what do we have before us I thought what we had I view this as a reasonable accommodation case is that not what we have before you have a case that has I have a age discrimination claim I have a disability discrimination claim I have a retaliation and I also have a failure to accommodate claim the three besides looking at failure to accommodate those three were kicked out on no adverse actions shown and in your argument before us in the briefing this public fight read it right although you drop a footnote which seems to say hey we're reserving all our claims everything you've argued revolves around the alleged discrimination based on disability right there's no comment about retaliation or about age life major life function they were obligated to give her an accommodation they didn't do that and they treated her badly so correct me if I'm wrong and show me where I'm wrong but all the argument that's been made here revolves around disability discrimination am I correct no oh really no I thought it was failure to accommodate because the district court said that you don't have to accommodate based on what's outside the workplace that's what I understand we're doing and I think it's your argument that this takes place in the workplace because that's where the shifts are set that's certainly one of our arguments but I may cannot I I just want you to help me because I don't want to to view you speaking of waiver which you've sat through listening a lot about I show me in your in your briefing take me to it if you would where something else is argued here besides the disability discrimination if I can grab my you bet if you look on page 11 under argument number three I state a reasonable person could find that Colwell was forced to resign because right aid would not change her shift did not respond to her complaint that she was being treated differently and she became physically ill based physically ill based on should be her mistreatment and I footnote one the district court dismissed all claims based on the fact that it concluded that Colwell could not establish an adverse action consequently Colwell seeks revival of all claims disability age discrimination retaliation since she can show that she was forced to resign okay and I think that's the footnote I explicitly referred to when I asked my question I know this footnote is in here what I'm asking you is is there any argument framed in this brief that talks about anything other than age discrimination if there's not that's okay just know whether I'm excuse me discrimination if there's something if you've argued in here other than this footnote anything about disability discrimination then I've missed it and I just want you to point out so they don't miss it I hear what you're saying your honor however this the court decided this case on adverse action on all of my claims so certainly that is what I'm addressing and it makes no sense for me to say oh I'm appealing it something that the judge didn't decide the judge throughout all claims based on the fact that I could not establish an adverse action I think I have your under I think I understand your argument if you convince us on the failure to accommodate is there anything else we need to do yes deal with the fact that I have an adverse action because well so what what difference does that make because I get what in the totality of what's before us haven't you won if you show us that there was a failure to accommodate as required by the statute what beside that should we get into because I have outlined in my complaint and I fought for the other claims of age discrimination what would you get from them because a jury who knows what a jury is gonna decide they may decide one thing they may decide another thing that's why to have as many claims as I possibly could you do this all the time I'm not sure you're right on this one but okay I know she's up but I do have some other questions yeah from her side but the EOC right now as the disability discrimination we're only talking about the substantial limitation on a major life function here no arguments been made about a record of impairment or about being regarded as disabled correct no and this is the judge had to decide that there was my client was disabled so I don't need to appeal anything because I'm just trying to make sure I understand your argument okay so the only thing the basis of the disability is claimed is that limitation of a major life function nothing else right I had the judge had found that she was disabled but I had argued that she was regarded as ours as a record of what he found her actually what what more would you get if you win on the failure to accommodate a disabled person is there anything would you get what what would you get if you what we can but what would you get if you show us that I would get the fact that I have you never know how individuals on a jury are going to decide that's not what I asked you I asked you what are you entitled I think the damages are a little different with the ADA versus the age discrimination difference in I know there are some punitive issues yes so there may be some issues now maybe you're the lawyer you have to tell us what your claim is yes and our claim is all damages but you asked me with the differences between the two what do I get more if I get a retaliation claim it's easier for me to prove an adverse action when I get a retaliation claim because I don't have to show so much well what do you have to show what's the so much you don't have to show that I like a job losing your job I don't have to show that in a retaliation claim versus on a straight disability discrimination claim I have to show and add a higher standard okay thank you well you better tell us who you are may it please the court my name is Paula Brunner and I am a counsel for the Equal Employment Opportunity Commission the amicus curiae in this case I had planned to address the issue of reasonable accommodation but I'm willing to well do you agree with Miss Pollack that she's more if she proves retaliation your honor if she proves retaliation and you do agree with the court on the failure to accommodation claims which point I'm sorry if you agree with the plaintiff that the summer judgment was inappropriate in this case there is possibility that you may find compensatory and punitive damages were warranted beyond just the accommodation itself what is she entitled to if on you you we read your brief yes it's very effective what is she entitled to if you show us that they fail to accommodate her what damages what remedy can she get on a demonstration that she was not accommodated one would take into consideration what putting her back type relief that would put her in a position that she would have been in one being her job or working for writing if that's possible yes your honor for the time period that she was not working if it was not appropriate to put her back at the old Forge store and there were not other positions open at another store to place her you would consider front pay because of the futility of being able to put her back in a position that she would have worked but for this discrimination also damages I'm sorry she entitled to punitive damages in this particular case that that would be something that would go to a jury I think that there is room here to suggest that there are punitive damages warranted just to deter right aid from engaging in this type of non-accommodation behavior again particularly since right aid had no either right aids human resource person nor miss Chapman the store manager had any type of human resources background or certification they had not done any disability training what little bit of procedures they had in place were not followed by the store manager have there been cases that have awarded punitive damages for a failure to the top of my head your honor I cannot cite you a case in which punitive damages would be warranted but this is an ad hoc decision and I think it's something that would definitely rest on the facts of each individual case so in this statute provide for punitive damages yes absolutely that the statute does yes absolutely in the context of failure to accommodate in the context of disability discrimination which failure to accommodate is a form of would you like for me to somebody has a question I do and I'll ask it pretty quick so you can say what you'd like to say after that here's my question much of the discussion seemed to be like people sort of talking past each other in the that this is a this is the major life function issue here is seen from the defendant the major life function here is night driving this does the EEOC have a position has it taken a position on whether or not being able to drive is a not but I will tell you that there is actually no dispute from the plaintiff's perspective that the major life activity she asserted was vision seen and not driving I understand her position clearly now and this is something that perhaps it could ask miss pollack when she's back up here the record appears to show Ms. Caldwell saying pretty emphatically the only thing my loss of vision effects is my ability to drive at night that that's it I can do everything else and I do do everything else fully functional fully the only thing this that I can't do is get here at night now that's certainly the way the defense frames it and and I've kind of gone in and tried to read the the appendix and and seen where that quotes from the deposition so assuming that that were true that that really is the only manifestation in her life of the problem with her vision is that she can't drive at night does that are we talking about the very same thing but just using a different word when we say this is about vision and not about driving now your honor this is clearly about vision miss Caldwell did proffer more than just the inability to drive at night she made it very clear that she had difficulty seeing objects that were to the left of her in essence her out of her peripheral vision that she had depth perception issues that she had field horizontal field issues and impediments but it was but but driving at night amplify the problems that she was experiencing that she also continues to experience painful pressure in her eye for which she needs surgery but cannot afford because she no longer has a job so in the meanwhile she's just taking eyedrops to that gives limited relief to that question please affect her work at Rite Aid how does the vision impairment affect her work at Rite Aid was the question your honor it affects her work because the store manager continued to schedule her for evening shifts and listen to the question does it affect her work at Rite Aid it affects her no no your honor it does not affect her position once she enters the front door of Rite Aid yes she can absolutely use the front door of Rite Aid your position has to be that Rite Aid must take care of getting her to the front door our position is Rite Aid is responsible for removing any impediment to her access to equal opportunity and the impediment in this case is her work schedule. The phraseology comes from the statute which requires the employer to address any known physical or mental limitation that impedes the person's ability and access to the workplace in under reasonable accommodations in the statute itself it says modified work schedule yes that's in B and even in A making existing facilities used by employees readily accessible and usable by individuals speaks to external impediments that may impede the access and and then in B to provide part-time or modified work schedules within the legislative history and understanding that if a rigid work schedule is impeding that person's ability to enjoy an equal opportunity of it should be removed. Let me pursue this a little bit. Yes your honor. If she's living in an area that has no bus service and she can't drive is the employer obligated because she happens to have bad legs is it an employer obligated to get her to Rite Aid? No your honor. Please, please. What's the difference? The difference is what she is asking for is a shift accommodation. She is not asking the employer to provide her with a driver or a car service or public or any type of transportation. She is simply asking for something that is totally within the employer's control which is a shift modification. Wait a minute, wait a minute. Please, please. You're matching criteria here now that I think are important. You say the accommodation must be within the ability of the employer to furnish. Which in this case it is. All right now assuming that a person is disabled and there is an accommodation within the power of the and can still do the job but can't get to the workplace for one reason or another. For a reason that is caused by their disability your honor? Yeah, all right. Because that's important. It's got to be tied to. Let's say, all right, please listen to me, please. Slow down. We'll all get there. Say the person can't walk and they can't get to the place of business because there is no bus service and they can't drive. Is the employer required to do something about that? No, your honor. Because that's not a reasonable accommodation. Exactly. I think the answer to Judge Wise is that the statute specifically gives examples of reasonable accommodation and those were the ones you mentioned before. Job restructuring, part-time or modified work schedules and other similar accommodations. So, I think. Yeah. The question is, does the accommodation have to relate to, not the disability, but to the work being performed? No, your honor. It does not have to relate to the work being performed and there is nothing in the statute that calls for such a requirement. Under the ADA. Before you go too far, the statute says the covered entity shall not discriminate against a qualified person on the basis of disability. In regard to job application, the hiring and vacuum discharge, job training and all and other terms, conditions and privileges of employment. So, the statute specifically ties in discrimination to employment. And your honor, in this case, the accommodation is directly related to her employment. It is her shift that she is seeking to have modified. An accommodation that is clearly identified in the statute. Shifting ground. You can envision all sorts of situations where a person has a disability and they want help from the employer, but it doesn't affect their work. Let's imagine a situation where a person can't walk very far, but he can work once he gets to the front door. And he wants a private parking space because when he comes in late, all the good spots are taken and he has to walk a couple hundred yards to get to the front door. Is the employer bound to give him that accommodation? The Second Circuit thought so. In the case of Lions v. Legal Aid Society, that was the very type of accommodation. I read that case and it doesn't say that. I'll give you a different hypothesis. Your honor, if in fact the employer is... I'm trying to get at the point. Is the accommodation related to job performance? No, your honor. There is nothing in the statute that requires the accommodation to be related to job performance. If it's reasonable, huh? As long as the accommodation sought advances within the employer's control, is possible, and removes the impediment to that person being able to perform their job duties. In this case, access is the impediment here, caused by her shift, her being required to work an evening shift. I suppose a woman wants to get a job, and she says, well I want to work from 10 o'clock till 3 o'clock, because I have to take my grandchild to the bus at 9 o'clock, and I have to be there to pick her up at 4 o'clock in the afternoon. Now let's say this woman is also disabled. Pick out any disability you want. Does the fact that she wants the hours give her the right to ask for an accommodation? Your honor, the reason she's asking for the accommodation is to pick up her grandchild, correct? As opposed to her being able to work the job. In your hypothetical... She's able to work the job when she gets there. Your honor, in this case, picking up the grandchild was not the impediment. It was the work schedule. Ms. Cowell wanted to work this job. She was capable of working this job. She was qualified to work this job. The impediment was her work schedule, which impeded her access. If, in fact, Rite Aid were to accommodate her and to grant her a daytime shift, the reason this is not about driving is she would have been able to take public transportation, which was available during the daytime. She would have been able to take a cab, which was also available during the daytime and not the evening shifts, in addition to possibly driving herself. Let me ask a question, if I might. Since the record we're presented with includes a statement like the following... This is from her deposition, page 85. The question is, at the time that your condition was diagnosed in the summer of 2005 and while you were working for Rite Aid, what kinds of limitations did you have as a result of the eye condition, if any? And the answer is, the only thing that would be a limitation, because I could see perfectly well with my right eye and perfectly capable of doing any duties that I was required to do, the only limitation was night driving. And then the follow-up question on the next page was, how about in your everyday life, things you would do outside of work in the same time frame, summer and fall of 2005? Did you have any limitations as to what you could or could not do besides the driving? The answer, besides the driving, no, none. And then a couple of lines later, no, I have none. Now, I'm asking you this question because I'm asking about a broader issue than just this case, okay? Yes, sir. And I don't want to speak for anybody but me, but I'll have the temerity to do it. I don't think there's anybody on this panel that doesn't feel a great deal of sympathy for somebody who's lost sight in one eye. That's a terrible loss. But it appears that she has, by her own sworn testimony, said, the only way this affects my life in my everyday life or at the job, the only way it affects my life is I can't drive at night. Now, so here's my question to you. If that's the record before us, how do we say this was an impairment that deserved an accommodation and not have that interpreted by people as saying that driving at night is a major life function? How would we frame a discussion of this or a holding on this without doing what the Sixth Circuit had said in that unreported Wade case that would make, you know, 45 million people, I'm sure a number they pulled out of the hat, but for rhetorical effect, are disabled all at once because there are many people who can't drive at night for one reason or another. So the short of it is how would we limit a holding given this specific record? And you want the holding to relate to her having a disability or being entitled to an accommodation? Well, either one. I mean, because it looks like she said the only thing I can't do is drive at night. Well, first of all, Your Honor, thank goodness this is not that case where your facts are limited to just those allegations. She did, in fact, allege other ways in which she was impeded in her vision area, which I've already recounted and already set forth in the brief. To address your issue, if it were, in fact, just limited to these facts, why can she not drive at night? Because her vision is impeded. How is her vision impeded? Peripherally and field and horizontal under Kirkenberg. All she has to demonstrate is that as a person with monocular vision, she is clearly disabled and she's met this not so onerous burden of establishing that she's disabled. Why? Because she was 66 years old when she became blind in one eye. So there's been very little time for compensation so that she can somehow learn to live with vision out of just one eye and work. She has also shown that she is significantly restricted in comparison to the average person that can see out of both eyes. She has no sight in her left eye. She cannot see out of her peripheral vision. She cannot see whoever's beside her. She bumps into people when she's driving. She's not sure what lane she's in. All of these are distinctly different from a person who can see out of both eyes. So is your argument, your bottom line argument, that as in that Second Circuit Copianco case, that night driving is a point of evidence, but a statement in a case like this is not a statement equivalent to night driving as a major life function. It's only one piece of evidence in talking about vision as a major life function. That is correct, Your Honor. That driving is a byproduct of the fact that she cannot see. All right. I have your argument. Thank you. Thank you very much. If there are no further questions, we'll hear from the appellee. Thank you. Thank you. Good afternoon. May it please the Court, Amy McAndrew from Pepper Hamilton for the appellees, Friday Corporation, and Susan Chapman. I've heard several times now throughout the arguments a reference being made to the fact or the alleged fact that Ms. Colwell could not get to work as a result of her inability to drive at night. But the actual record shows that Ms. Colwell got to work every time she was scheduled for work. I thought it was remarkable because you seemed to pitch that argument, Ms. McAndrew, as if her being a really good employee was somehow something that should work against her in this case. It seems the question is really not so much whether she was able to overcome the problem of getting to work, but whether she told your clients, I have a problem getting to work, which the record seems to be undisputed on. She did. She went to Ms. Chapman and she said, this is creating a real problem for me. Why isn't that under our case requiring employers to engage in an interactive process, why is that not enough to put Rite Aid on notice that they need to start thinking about whether there's an accommodation in order? Your Honor, I would respectfully disagree that the record clearly shows that Ms. Colwell stated this was a problem for her. The testimony actually shows, and we've cited that portion of the record in our brief, that Ms. Colwell and Ms. Chapman had a conversation. When Ms. Chapman got the letter from Ms. Colwell's doctor saying, I recommend that Ms. Colwell not drive at night, Ms. Chapman actually approached Ms. Colwell, which I think the employer is obligated to do in that situation, to have a conversation, to engage in an interactive process. And at the end of that conversation, Ms. Chapman walked away thinking that Ms. Colwell had it covered. She could get rides from her son or her grandson. At the end of the day then, are you suggesting that there's a material issue of fact here that requires a reversal? Because if her version of the facts is, I thought we had it all worked out, and Ms. Colwell's version of the facts is, we were far from worked out and they should have known it because they got the union rep involved, we had a meeting set up, they had to know I wasn't happy. If those are two competing sets of facts, how is it that the judge is deciding the outcome here and not a jury? Well, not at all, Your Honor. I think because Ms. Colwell also testified that, yes, I absolutely said during that conversation that I could get rides. And there are references in the appellant's brief to the fact that she at some point said to the manager, this could be a hardship for my family. But the record actually shows Ms. Colwell never said that to the manager, she said it to a coworker. Aren't we obligated to look at this record in the light most favorable to Ms. Colwell? And I think even if we do, we come out with the finding that there's no dispute of material facts. I'm taking that as a yes, right? Okay. Yes. So since we're obligated to look at this in the light most favorable to her, and it's undisputed that they have a discussion, and the content of that discussion apparently is in dispute, because I'm hearing very different things from the plaintiff than I am from you about the content of that discussion. And if the content of that discussion being in dispute also includes a follow-up meeting that was supposed to take place, from which one could infer, if you were inclined to look at this in the light most favorable to Ms. Colwell, that there was a continuing problem, why isn't that in and of itself enough to say, hey, there's a genuine issue of material fact as to whether or not Rite Aid knew that there needed to be an accommodation here? Why isn't that? Rite Aid, and I agree with you, obviously. I can't disagree that we need to look at the record in the light most favorable to the plaintiff. That's pretty settled law. But I think when you do look at the record, and you see that it's not just that, perhaps Ms. Colwell herself came away from that conversation with a different thought in her mind, but Rite Aid's not obligated to be a mind reader. Their obligation is to engage in it. Well, let's go into whose obligation it is, if I can. I gathered from what you said that you think that because Ms. Colwell may have said that I can get rides from my family, that takes the employer off the responsibility of making a reasonable accommodation. It's my understanding that the statute talks about the employer's responsibility. And why does the fact that she might have been able, I mean, did she work, she was a part-time worker, right? Yes. Okay. How many days a week did she work? It varied. It was approximately 15 to 20 hours a week. Okay. And if she couldn't always get her son or her brother or somebody to drive her, then Rite Aid, the employer, had no responsibility under the statute? Well, I mean, the statute does require the employer to make a reasonable accommodation. Is that right? Well, I have a couple of responses to that, if I may. Sure. One is that the record does clearly show Ms. Colwell testified that there was bus service that ran until about 6 o'clock at night. She was never scheduled to start after 5. So there was never a question that she could get there. So she could get there, but she had to walk home? Well, there was never a question that she could get there. And as I said, although you were not impressed with the argument, she always got there. She always had a family member who could get her there. With regard to whether or not there's an obligation to reasonably accommodate, I think that's where really my argument and the plaintiff in the EEOC's argument greatly diverges. The question becomes, what is the employer's obligation to accommodate? And the statute says what it is, doesn't it? Well, the ADA says that it prohibits discrimination, and Judge Weiss pointed this out, with regard to terms, conditions, and privileges of employment. Which include also shift making. It uses the word shift, doesn't it? It does talk about changes to schedules, absolutely. And am I wrong in thinking, and I'm trying to find it, that the district court said that it's because the barrier to the employee's ability to work didn't exist inside the workplace, then the employer has no control. But the shift is set inside the workplace. So how can we, can you tell us why we should agree with the district court that it doesn't cover a shift? Well, Your Honor, if you look at, and I think this is where the district court was getting this from, if you look at regulations, the regulations interpreting the ADA say that accommodations are directed at allowing an employee to perform the essential functions of their job. And as we've already said, Ms. Colwell was capable of performing the essential functions of her job once she got to work. Yeah, once she got to work. Now, so I certainly recognize that you rely on that to have the sort of front doors where our obligation begins. which the district court accepted. But if that were actually the limit of the statute, why would there be a discussion of shift changes in the statute? If the only thing that mattered is what happened when you stepped in the door, what's the purpose in talking about shift changes as a reasonable accommodation? I think that actually the EEOC cited to a perfect case to address this issue. It's the Giles versus United Airlines case out of the Seventh Circuit, I believe it was. In that case, an individual with a mental impairment. She had a problem with regards to, I believe it was epilepsy, and she needed to get solid sleep, consistent sleep at consistent times, or her condition got worse. Therefore, she wanted to consistently be on days. Because she said if she was on nights or if she was switching back and forth between days and nights, it would not allow her to do her job, but also it would make her condition get worse. And to me, that's exactly where the shift accommodation issue goes. I don't understand your answer. If the shift accommodation can be done by somebody inside the Rite Aid office saying, okay, you can have a daytime shift, what does that have to do? Why isn't that covered? Your Honor, I think it goes to what the original intent of the statute was. Yeah, but we know this intent. I mean, in this instance, you know the intent by looking at the statutory language. And one could argue, and certainly we do, that the statutory language is pretty clear. It says shift, doesn't it? Well, but if you talk about what an employer is required to accommodate, if you look at the EEOC's enforcement guidance, for example, it states, quote, that reasonable accommodation removes workplace barriers for individuals with disabilities. Evidently, the EEOC is not agreeing with your interpretation of the statute that they're tasked to enforce, right? Because they're here as amicus to say that your view of it is wrong. But just to make sure I understand your argument, you're saying if she had thought to say, you know what, I work so much better in the light because artificial light with only one eye, that gives me a hard time, so I'd really rather be in the store during daylight hours where there's more natural light coming in the store, it works better for me, that that would make all the difference in your argument, right? Well, Your Honor, I think a quick answer is probably yes. But if I could address a couple of issues there, one is that, obviously, the parties need to be engaging in the reasonable accommodation interactive process in good faith. And that would obviously be, based on this record, that would not be an accurate representation. I'm not suggesting that she should make something up. I'm posing to you a counterfactual, perhaps, maybe it is factual, but because, I don't know, because the case, it's over at this point, but by your reading of that Giles case, that assertion would have said, would have been enough to say, okay, now we've got to make a shift change. Or now we at least need to engage further in the interactive process. And on that question of interactive process, you would agree, wouldn't you, that the employer is not entitled to just say, no. Go ahead, give me your next best shot. I think to engage in good faith, yes, it has to be a back and forth. That's what this Court has said in the Koning case, for example. And I think that there was an intent that there would be a back and forth because, like I said, there were two conversations. There was a scheduled meeting with the union representative. And once the union representative gets involved, that is supposed to be Ms. Caldwell's agent. Right, and do you dispute that the union representative said, I've talked to Ms. Chapman and there's nothing happening. You're definitely not getting only day work. Yeah, I know that that was Ms. Caldwell's testimony. And if we have to take the facts in the light most favorable to the plaintiff, I guess we have to accept that, although it is hearsay. Well, but you didn't put anybody on to say the contrary, did you? No, we didn't. And presumably, if it were to go to trial, the union rep could be put on the stand, right? Absolutely. Okay. Now let's go back to Judge Jordan's hypothetical about the daylight. I mean, the employer's obligation is to make a reasonable accommodation that the employer can. If it were a building in which one room had daylight and another room didn't, and all that the plaintiff was asking was to go to the room, move her desk to the room where there was daylight, that would be a request for a reasonable accommodation, right? That could be, depending on other factors, of course. Okay. But if it were a building that didn't have any windows, like this building, some parts of this building but not really, then it wouldn't be reasonable to expect the employer to provide daylight, right? To build a window, correct. And your client never said, as I understand it, we cannot give her a day shift, right? The employer actually did say that it would be difficult, based upon the schedules of other employees. We were in a situation with a collective bargaining agreement. Ms. Caldwell herself had some unavailability due to her personal commitments. It may have been difficult to give her only days. Difficult but not impossible. We have not taken the position that it would have been an undue burden. That is true. Okay. That's all. Go ahead, Judge Weiss. So are you saying that there could have been some accommodation worked out, perhaps that the employer would look around the store and see if anybody else was willing to take her home at night? Well, I don't know if that would have been a reasonable accommodation, that the employer would have been free. She gets there on a bus and she needs a ride home. Would it be unreasonable to ask the employer to circulate a request among all employees? Would you take this woman home at night? I don't think that would be unreasonable as a practice, but I don't know that it's required by the statute, Your Honor. There's nothing in the record that indicates that there were people available to take her home at night. Is that right? There's nothing in either direction, Your Honor. There's no evidence. The record is silent on that issue. No evidence that anyone ever looked into that issue. If it goes to trial, that's something that can be looked into, right? As far as it goes to reasonable accommodation, what's the duty of the employer? Do you just say there's no bus service and then stop, or are you required to take some further steps? And, of course, our argument, Your Honor, would be that because commuting is so entirely outside the workplace, there was no need or no ability to accommodate. That's what the district court held. Yes. Is there a position that you're taking? Let's assume that this is not a problem that developed after Ms. Caldwell had come to work, but that she were, I mean, we don't say Ms. Caldwell. Ms. X comes and applies at a Rite-Aid store and says, I can do this job, got plenty of experience, fastest cashier you'll ever see, but I can't work at nights because of my disability. I have an eye condition that makes it impossible for me to get here at night. Other than that, I'm good to go. Does the law permit Rite-Aid to say, well, we're not hiring you because we're not going to just have somebody in here for daytime hours? Well, Your Honor, I think that still goes to what is the employer's obligation under the ADA with regard to reasonable accommodation. Well, doesn't the ADA require that you not refuse to hire people because of their disability? If they can otherwise perform the essential functions of the job. I mean, failure to hire is one of the things that you cannot do in light of disability. Isn't that right? Agreed. Although I don't see a difference from an employer's point of view. You're still asking for an accommodation that is well outside the workplace. Well, are you really asking for something well outside the workplace? If the person says, my only issue is I cannot come at night. I'm good to go any other time because of my blindness. I can't do it any other time. Is the distinction, well, I guess maybe I have your answer. Your answer is, it's the front door, period. Right? Because once she's there, if she's good to go, however, if she said, you know what, I need to work in a sunny place, then you would have to hire her. That seems to be where you're going, which strikes me, frankly, as a curious thing. That you would be required to hire somebody who said, I'm even more disabled because I've got to have help in the workplace. So it will be more expensive for you, more of a challenge for you, but you've got to hire me. But you're the same person with a little less of a disability, you can say, not because it doesn't impact what happens once you walk in the gate. Have I understood your argument correctly? I think so, Your Honor. I think that the real question for the employer is, where does your obligation begin and end? Even though the accommodation is exactly the same in the end, right? The accommodation would be, you can work daytime hours. I think that's correct. I think the question is, are we going to sit here and substantially expand the obligation that an employer has? Now, on top of everything else, I have to figure out if you can get to and from work. So her big mistake was not being disabled enough, right? Based on your hypothetical, I can see that. I'm with you. All right. I'm not, but that's beside the point. Okay. Thank you very much. Thank you very much, Your Honor. Obviously, it's the appellee's position that the district court's opinion be affirmed. Thank you. Thank you. How many minutes does Ms. Pollack have? Two. Yes. Okay, we're going to keep you to the two. That's 100% okay. I'm good with that. The one thing that you raised was all these other claims. And don't they all have to get, if you're right, and then, and we have to, if, we have to reverse on the failure to accommodate. The district court didn't handle or didn't handle the way you wanted these other things. That all goes back, and the district court has to decide, or the jury has to decide. You still, you have not given up your retaliation claim, your workplace discrimination, et cetera. Right? Well, I've seen some of your opinions that you only allow some claims, like, back down. So, if you're telling me that if you were, like, that's the process, you know, if you get one reversal on one claim, everything goes back. Well, if, to the extent that you preserved your other claims, you did preserve your other claims, right? Correct. Okay. If that's the way the third circuit. Let's just raise a question in my mind, though. You made the record you made, right? I mean, this was summary judgment, and, in fact, you moved on behalf of your client for partial summary judgment, right? Correct. Okay. So, if the district court, on the record the district court had before it says, you know what? There just simply is no constructive discharge here. There's not enough on this record to say there was constructive discharge. If that's, I mean, if the case goes back, would your, on the reasonable accommodation point, would your argument be that, no, I get to put in more evidence to substantiate a constructive discharge claim? Well, I would get a jury trial, so I could present everything a whole different. If it's still open. If it's still open, I can present anything, because then it's a jury that decides. If it's still open. So, I could bring the union guy in or whatever. But the district court said, I think you told us, the district court said there was no adverse action. Correct. And you want us to say there was adverse action? Correct. And does your brief talk about that? Yes. Okay. Could I just say one thing, only because I didn't get to say anything? Yes, you did. You answered that question. All I wanted to say is that the shift change is what was in control that Rite Aid had, and it accommodated other people, like a college student. They were able to work with a college student. So, how could you not work with my client? Yeah, we took care of that in our discussion with her, because they don't say they couldn't have accommodated her. And that answers that. And if I could just read from the Lyons case, the Second Circuit, just that they – Yeah, we can read it. Okay. Thank you. We can read other cases. Thank you. Thanks. Two minutes is two minutes. Okay. Thank you. I'm going to have to clear the courtroom of everybody, because Judge Wise is in Pittsburgh. We're going to do our conferencing in the courtroom rather than in chambers. Includes my people, too. Thank you. Thank you very much.